THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:22-cv-01423 |
| | ) | |
| STATE OF WISCONSIN, | ) | The Honorable J.P. Stadtmueller |
| | ) | |
| Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONTAINER LIFE CYCLE | ) | |
| MANAGEMENT LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**UNITED STATES' BRIEF IN SUPPORT OF ITS
MOTION TO ENTER CONSENT DECREE**

**Introduction**

The United States submits this brief in support of its motion for entry of a proposed Clean Air Act and Resource Conservation and Recovery Act ("RCRA") Consent Decree that was lodged in this case on November 30, 2022 (ECF No. 3-1).[1] If approved and entered by this Court, the Consent Decree would conclude this case on the terms and conditions set forth in that settlement agreement. The State of Wisconsin, which co-signed the proposed Consent Decree and has submitted an unopposed motion to intervene as a co-plaintiff in this matter, ECF No. 2, has authorized the United States to represent that it continues to support approval and entry of the Consent Decree.[2] The sole defendant – Container Life Cycle Management LLC ("CLCM") – has co-signed the proposed Consent Decree and supports its approval and entry as a final judgment in this case.[3] The information presented in this brief demonstrates that the proposed Consent Decree meets the well-established standard for judicial approval of an environmental enforcement settlement negotiated by the federal government: it is fair, reasonable, and consistent with the goals of the relevant environmental protection statute. *See United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011) ("the district court must approve a consent decree if it is reasonable, consistent with [the statutory] goals, and substantively and procedurally fair").

---

[1] In this brief, docketed filings in this case are cited by reference to the ECF system docket number, often with page citations to the page numbers applied by the ECF system, using the citation format "ECF No. __ at ___." References to particular paragraphs of the proposed Consent Decree lodged as ECF No. 3-1 are abbreviated as "CD ¶ __."

[2] The State submitted a proposed Complaint in Intervention alongside its unopposed motion to intervene. ECF No. 2-1.

[3] Upon signing the proposed Consent Decree, CLCM confirmed that the company "consents to entry of [the] Consent Decree without further notice and agrees not to withdraw from or oppose entry of [the] Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified CLCM in writing that it no longer supports entry of the Decree." CD ¶ 105.

## Overview

CLCM operates two industrial container refurbishing facilities in suburban Milwaukee. The facilities are located in mixed residential and industrial neighborhoods in the cities of St. Francis ("St. Francis Facility") and Oak Creek ("Oak Creek Facility"). At both Facilities, CLCM receives used industrial containers from its customers, cleans them and either returns the refurbished container(s) to the customer, or sells them. The Complaint, Complaint in Intervention, and the proposed Consent Decree in this case concern alleged civil violations of the Clean Air Act and RCRA at the Facilities.[4]

Between early 2017 and 2019, the Milwaukee Journal Sentinel published a number of articles regarding neighborhood complaints about odors and air emissions from CLCM's St. Francis Facility.[5] The articles also identified issues regarding CLCM's handling of used industrial containers at its Milwaukee-area Facilities, quoting a former CLCM consultant who raised concerns about worker safety and environmental compliance at CLCM's operations. Following publication of the initial articles, EPA and the Wisconsin Department of Natural Resources conducted air and hazardous waste inspections at CLCM's Facilities, which are referenced in the Complaint (ECF No. 1 at 13-14) and Complaint in Intervention (ECF No. 2-1 at 15). The United States and State issued violations notices following these inspections. *See* ECF

---

[4] CLCM is a joint venture that began operations at the St. Francis and Oak Creek Facilities in 2015. The Facilities were previously operated by MidAmerican Steel Drum, which, alongside Greif, Inc. is one of the participants in the CLCM joint venture. CLCM previously also operated a Milwaukee container refurbishing facility ("Milwaukee Facility"). During the course of settlement negotiations, CLCM ceased operations and sold its assets related to the Milwaukee Facility. The Complaint and Complaint in Intervention include claims related to RCRA violations at the Milwaukee Facility, but the Consent Decree does not include injunctive relief associated the Milwaukee Facility because it is no longer operating.

[5] *See* https://projects.jsonline.com/news/2017/2/15/chemicals-left-in-barrels-leave-many-at-risk.html; https://www.jsonline.com/story/news/investigations/2018/10/03/whistleblower-epa-doing-criminal-probe-barrel-plants-wisconsin/1498468002/.

2

No. 3-3, 3-4. Thereafter, the United States, State and CLCM engaged in extensive settlement negotiations that resulted in the proposed Consent Decree.

In accordance with Department of Justice policy, notice of the proposed settlement was published in the Federal Register, which commenced a 30-day public comment period running through January 5, 2023. *See* 87 Fed. Reg. 74,663 (Dec. 6, 2022). The proposed Consent Decree recites the fact that "[t]he United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate." ECF No. 3-1 at 60 (Consent Decree ¶ 105).

One comment was received. This comment was from Will Kramer, the former CLCM consultant identified in the Milwaukee Journal Sentinel news articles. A copy of Mr. Kramer's comment, without its voluminous attachments, is attached to the United States' motion to enter the Consent Decree. ECF No. 7-1. In his comment, Mr. Kramer explains that he "was a safety consultant for CLCM in 2015-16" who "observed systemic violations of RCRA built into the standard operating processes" at CLCM's Facilities. *Id.* at 3. He also states that he recorded "numerous conversations with CLCM's safety manager" about CLCM's operations and "provided [these recordings] to the U.S. Securities and Exchange Commission and later to the Milwaukee Journal Sentinel." *Id.* Since 2019, CLCM and Mr. Kramer's former employer have been engaged in civil litigation regarding Mr. Kramer's disclosure of information about CLCM. *Id.* at 29-30. Mr. Kramer's comment identifies several concerns about the settlement. They fall into two general categories. First, he asserts that the relief secured is not adequate to ensure CLCM's compliance with hazardous waste requirements, and that the settlement does not address alleged other past violations related to disposal of hazardous wastes by CLCM and its predecessors. Second, he claims that the penalty is insufficient to address: (a) prior non-

3

compliance by CLCM and its predecessors, (b) RCRA violations by others in the container refurbishing industry; and (c) "retribution" and "retaliation" by CLCM in the ongoing civil litigation regarding his disclosures. At the conclusion of his comment, Mr. Kramer requests that this Court abstain from approving the settlement unless CLCM agrees to dismiss that case and not seek damages from him. *Id.* at 36.

The Department of Justice has determined that nothing in the comment justifies the withdrawal or rejection of the proposed settlement. In fact, as discussed in Section 3.b below, the proposed Consent Decree will ameliorate the concerns raised in the comment about CLCM's operations. The settlement requires CLCM to implement a container management plan ("CMP") that sets forth detailed container handling and recordkeeping requirements, and storage requirements to ensure that any containers that hold residual hazardous waste are managed in a secure manner. Further, the settlement is expected to permanently reduce air pollutant emissions from and within the St. Francis Facility and the Oak Creek Facility, as explained below. It also would impose enhanced monitoring and reporting requirements. And it would collect a civil penalty of $1,600,000 for alleged past violations of the Clean Air Act and RCRA by CLCM. As discussed in greater detail below, the penalty amount reflects the United States' assessment of the penalty factors set forth in the Clean Air Act and RCRA.

Section 1 of this brief provides background information on the Clean Air Act and RCRA claims addressed by the United States' Complaint, the Complaint in Intervention, and the proposed Consent Decree. Section 2 summarizes the legal standards that govern judicial review and approval of an environmental enforcement consent decree negotiated by the federal government. Section 3 shows that the proposed Consent Decree meets those standards for approval and should be entered by the Court.

4

## Discussion

### 1. Background

#### a. EPA's and DNR's Inspections and Investigations

CLCM's St. Francis and Oak Creek Facilities are covered by an array of requirements under federal and state environmental laws, including regulatory mandates and permit limitations imposed under the Clean Air Act, 42 U.S.C. §§ 7401-7671q. This is because CLCM's operations at the Facilities result in the emission of air pollutants that are regulated under the Clean Air Act, such as chemicals classified as volatile organic compounds ("VOCs") and hazardous air pollutants ("HAPs"). CLCM also is subject to statutory and regulatory requirements imposed by RCRA, 42 U.S.C. §§ 6901-6992k, because CLCM receives, stores and generates materials that RCRA classifies as "solid wastes" at both Facilities. Some of the wastes CLCM receives, stores and generates are "hazardous wastes," for which RCRA establishes specified record-keeping and management practices.

As noted in the Complaint, this lawsuit stems from EPA and Wisconsin Department of Natural Resources ("Wisconsin DNR") investigations that spanned several years. ECF No. 1 at 13-14. EPA and Wisconsin DNR conducted a number of inspections of CLCM's Facilities in 2017 and 2018. *Id.* During these inspections, inspectors observed containers with residual hazardous waste being stored at the Facilities. *Id.* at 14. In September 2017, CLCM performed an air pollutant exhaust stack test of airborne emissions ("2017 Stack Test") at the St. Francis Facility in response to EPA's information request issued pursuant to Clean Air Act Section 114 (42 U.S.C. § 7414(a)). ECF No. 1 at 25. EPA outlined the Clean Air Act and RCRA compliance problems observed during those inspections in November 2017 Notices and Finding of Violation issued to CLCM (the "EPA Violation Notices"). ECF No. 3-4. The State issued related Notices

5

of Violation ("DNR Violation Notices"). ECF No. 3-3. Consistent with normal practice, representatives from EPA, the State, and CLCM met to discuss the Violation Notices.

The proposed Consent Decree would resolve CLCM's civil liability for the violations alleged in the EPA Violation Notices, the DNR Violations Notices, the Complaint, and the Complaint in Intervention. The Complaint and Complaint in Intervention allege a number of Clean Air Act and RCRA violations.

Allegations in U.S. Complaint

*Clean Air Act Violations*

- CLCM failed to appropriately control VOC emissions from the container washing processes at its St. Francis Facility, as required by the federally enforceable Wisconsin State Implementation Plan.[6] Further, as demonstrated in the 2017 Stack Test, CLCM's St. Francis Facility's potential to emit VOCs is 210 tons per year ("TPY), significantly in excess of the 100 TPY "major source" threshold that triggers an obligation to obtain a Clean Air Act Title V permit. CLCM had permitted the Facility as a "minor source," and therefore both failed to obtain and was operating without a required Title V permit.

- CLCM failed to comply with requirements in its 2015 construction permit for the St. Francis Facility to: (1) determine and (2) record the monthly total Facility-wide HAP emissions

---

[6]     The Wisconsin State Implementation Plan regulations require 85 percent control of VOC emissions from all "process lines." Wis. Admin. Code § NR 424.03(2). CLCM's systems of interior and exterior washing, soaking, and rinsing processes to produce refurbished containers at the St. Francis Facility are "process lines" under those regulations. Percent "control" of emissions is determined by both the technical capacity of the control technology to address the emissions and the extent to which the emissions are captured and routed to the control technology. Before its installation of a regenerative thermal oxidizer at the St. Francis Facility in 2018-2019, CLCM did not have appropriate emission control technology in place to control the emissions.

6

for each HAP; and (3) maintain the required exhaust airflow rate from the overspray filter for a paint booth at the Facility.

- CLCM failed to comply with permit monitoring and recordkeeping requirements at the Oak Creek Facility. CLCM further failed to maintain the drum reclamation furnace afterburner at a minimum required temperature. When the afterburner temperature drops below a prescribed temperature, combustion conditions are no longer sufficient to ensure that VOC and particulate matter emissions are properly controlled.

*RCRA Violations*

- CLCM receives containers with excess amounts of hazardous waste, which are not excluded from RCRA hazardous waste regulations under the "empty container" rule – codified at 40 C.F.R. § 261.7 – and CLCM then stores these containers without a permit, in violation of RCRA. In addition, CLCM failed to make, or failed to make accurate, hazardous waste determinations and failed to keep records of waste determinations at the Facilities.

Allegations in the Complaint in Intervention

*Air Violations*

- CLCM failed to appropriately control VOC emissions from the container washing processes and emitted objectionable odors from the St. Francis Facility in violation of Wisconsin law. CLCM misrepresented its VOC emissions when it obtained a permit from the Wisconsin DNR for the St. Francis Facility, and as a result, did not comply with otherwise applicable air emission limits.

- CLCM failed to comply with emission limits and recordkeeping requirements in its permit for the St. Francis Facility. CLCM failed to use filters with the required control efficiency

7

for particulate matter, and CLCM's air emissions exceeded the opacity limit. CLCM failed to keep complete records of inspections of the scrubber at the St. Francis Facility.

- CLCM failed to comply with an emission limit and recordkeeping requirement in its permit for the Oak Creek Facility. CLCM failed to comply with the limit on particulate matter emissions from the exterior and interior spray booths, and CLCM failed to make and keep complete logs for daily inspections of the spray booths.

*Hazardous Waste Violations*

- CLCM received containers with excess amounts of hazardous waste, which were not excluded from the definition of hazardous waste under the "empty container rule"—codified at Wis. Admin. Code § NR 661.0007(1)(a)—and CLCM then stored these containers without a license at its Facilities. In addition, CLCM failed to make, or failed to make accurate, hazardous waste determinations and failed to keep records of the waste determinations at the Facilities.

### b. The Proposed Consent Decree

The parties negotiated the terms of the proposed Consent Decree through multiple settlement exchanges between 2018 and 2022. The United States was represented in the negotiations by legal and technical experts from EPA, as well as counsel from the Justice Department's Environmental Enforcement Section. The State of Wisconsin was represented in the negotiations by legal and technical experts from Wisconsin DNR, as well as counsel from the Wisconsin Justice Department's Public Protection Unit. CLCM was represented by in-house legal and technical personnel and outside counsel with expertise in environmental matters.

Early in the settlement discussions, CLCM installed a regenerative thermal oxidizer ("RTO") at the St. Francis Facility. The RTO controls VOC emissions from CLCM's container refurbishing process lines at the St. Francis Facility. The Consent Decree would require continued use of the RTO at the St. Francis Facility. The proposed Consent Decree also secures

8

other injunctive relief to address air violations at the St. Francis Facility and the Oak Creek Facility, and hazardous waste violations at both Facilities. Key improvements included in the Consent Decree include the following requirements:

First, to address the Clean Air Act violations at the St. Francis Facility, the Consent Decree requires CLCM to construct additional emissions capture systems and make certain operational changes within the Facility to better control VOC emissions from the process lines it uses to refurbish steel and polyethylene containers. CD ¶¶ 24, 26, 27. In addition, the Consent Decree requires that whenever the St. Francis Facility is operating, CLCM must continuously operate the RTO according to established parametric set points, in order to achieve a VOC destruction efficiency of at least 98 percent. CD ¶ 25.

Second, to confirm the performance of the RTO and the associated emission capture systems, and to demonstrate compliance, CLCM is required to conduct performance testing according to an EPA and Wisconsin DNR approved protocol. CD ¶ 28. The Consent Decree further requires CLCM to install and operate various parametric monitoring equipment at the RTO and throughout the St. Francis Facility. CD ¶ 30.

Third, the Consent Decree's Clean Air Act compliance provisions for the Oak Creek Facility focus on improvements to the control and monitoring systems for the drum reclamation furnace and its afterburner. The Consent Decree requires CLCM to install and continuously operate a new digital data recorder to record the temperature of the afterburner, and CLCM must install a device to monitor whether the drum reclamation furnace is in operation. CD ¶¶ 18, 19. CLCM must maintain the afterburner temperature at or above 1,650 degrees Fahrenheit (or the temperature recorded during a performance test demonstrating compliance with applicable emission limits for particulate matter, visible emissions, and VOCs). CD ¶ 20. The Consent

9

Decree also specifies that CLCM must limit VOC and particulate matter emissions from the drum reclamation furnace, and demonstrate compliance through testing. CD ¶ 21.

Fourth, to address violations related to handling and storage of containers that hold residual amounts of hazardous waste, the Consent Decree requires CLCM to implement the CMP (container management plan) for a two-year period. CD ¶¶ 14, 16 and Appendix A. The CMP requires that, on the day of receipt of any container, CLCM screen the container using methods specified in the CMP. When containers arrive in a trailer, CLCM will need to unload the containers from the trailer for screening. CLCM must then mark and move any container that contains excess residual waste to a RCRA-compliant hazardous waste storage area, where it will be subject to hazardous waste characterization and held until returned to the customer or sent to a properly licensed facility for disposal. *Id.*[7]

CLCM must also keep detailed records of all containers that it receives and provide regular reports to EPA and Wisconsin DNR. This will allow EPA and the State to evaluate whether CLCM has meaningfully reduced its receipt of "non-empty" containers. CD ¶ 17. If CLCM's records indicate that it continues to receive non-empty containers, EPA and/or the State may pursue further enforcement action or require that CLCM obtain one or more permits to operate as a RCRA-licensed hazardous waste treatment, storage, and disposal facility.

Taken together, these agreed-upon injunctive relief measures should remedy the unresolved Clean Air Act and RCRA violations alleged in the EPA Violation Notices, the DNR Violation Notices, as well as the Complaint and Complaint in Intervention filed in this case. The

---

[7]    The CMP provides that, as an alternative to immediately unloading and sorting the contents of all trailers, CLCM may elect to construct a large RCRA-compliant trailer storage area. CD Appendix A § III.A.

settlement would only resolve those specified violations through the date the proposed Consent Decree was lodged with the Court (*i.e.*, November 30, 2022). CD ¶ 86.

As part of the overall settlement package, CLCM also would pay $1,600,000 in civil penalties (with half payable to the United States and half payable to the State). CD ¶¶ 8-12. The parties agreed on that penalty amount after significant give and take, but also with attention to published EPA policies that help ensure fairness and consistency in the settlement of civil penalty claims in Clean Air Act and RCRA cases,[8] and considering factors set forth in the relevant statutes and case law.[9]

Finally, the Consent Decree includes standard features to ensure compliance and enforceability, such as provisions on incorporation of Consent Decree requirements into permits, enhanced reporting, EPA and Wisconsin DNR review and approval of submittals, stipulated penalties for non-compliance, procedures for dispute resolution, and a retention of jurisdiction for judicial enforcement. CD ¶¶ 31-79, 99; *see Shapo v. Engle*, 463 F.3d 641, 643 (7th Cir. 2006) (recognizing the "inherent power of a court that has issued an injunction, even if that injunction ended the lawsuit, to enforce it, as by contempt proceedings").

---

[8] *See* EPA*, Clean Air Act Stationary Source Civil Penalty Policy* (Oct. 25, 1991), available at https://www.epa.gov/enforcement/clean-air-act-stationary-source-civil-penalty-policy-october-25-1991; EPA, *Revisions to the Resource Conservation and Recovery Act (RCRA) Civil Penalty Policy* (June 23, 2003) https://www.epa.gov/sites/default/files/2020-05/documents/june2003rcracivilpenaltypolicyamended050620.pdf; EPA, *Amendments to the EPA's Civil Penalty Policies to Account for Inflation (effective January 15, 2022) and Transmittal of the 2022 Civil Monetary Penalty Inflation Adjustment Rule* (Jan. 15, 2022), available at https://www.epa.gov/system/files/documents/2022-01/2022amendmentstopenaltypoliciesforinflation_0.pdf.

[9] *See* 42 U.S.C. § 7413(e)(1) (setting forth statutory penalty factors under the Clean Air Act); and *United States v. Torlaw Realty, Inc.*, 483 F. Supp. 2d 967, 974 (C.D. Cal. 2007) (identifying considerations a court may make when assessing penalty under RCRA).

11

## 2. Standard of Review

As the Supreme Court has recognized:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms . . . . Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation.

*United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971).[10] The Seventh Circuit cited similar considerations in affirming a district court's approval of a major Clean Water Act consent decree:

> Even the most diligent litigator may conclude that settlement is the best option – if only because it frees up enforcement resources for use elsewhere – and to achieve a settlement a litigant must accept something less than its most favored outcome.

*MWRD*, 792 F.3d at 825. *Accord United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1054 (N.D. Ind. 2001) (a consent decree that settles an environmental enforcement action may reflect a completely appropriate strategic election by the government to negotiate for "extensive relief without the burden of proving its case").

In judging a proposed consent decree that would settle an environmental enforcement action brought by the government, a district court should approve the settlement if the government shows that it is fair (both procedurally and substantively), reasonable, and consistent with the goals of the applicable law. *See Whiting Paper*, 644 F.3d at 372; *United States v.*

---

[10]     *Accord Whiting Paper*, 644 F.3d at 372 ("By its nature, a consent decree eliminates many possible outcomes that would have been better for one side or the other."); *United States v. Metro. Water Reclamation Dist. of Greater Chicago*, 792 F.3d 821, 824 (7th Cir. 2015) ("A consent decree is at base a contract" that embodies an agreed compromise of litigation.) (cited hereinafter as "*MWRD*").

*Lexington-Fayette Urban Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010); *BP Expl.*, 167 F. Supp. 2d at 1049.

A court should afford any such settlement "considerable deference" where, as here, it has been "negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *United States v. Fort James Operating Co.*, 313 F. Supp. 2d 902, 907 (E.D. Wis. 2004) (citations and internal quotations omitted). As the Seventh Circuit has noted, that deference recognizes both EPA's "expertise" and the "federal policy encouraging settlement." *Whiting Paper*, 644 F.3d at 372.[11] Thus, in the final analysis, "[t]he test is not whether this court would have fashioned the same remedy nor whether it is the best possible settlement." *BP Expl.*, 167 F. Supp. 2d at 1050.[12]

### 3. The Proposed Consent Decree Meets These Standards for Judicial Approval.

#### a. The Settlement was Reached Through a Fair Negotiation Process.

"To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Cannons Eng'g Corp.*, 899 F.2d at 86. *Accord WEPCO*, 522 F. Supp. 2d at 1112 ("Procedural fairness concerns the

---

[11]     *Accord Donovan v. Robbins*, 752 F.2d 1170, 1177 (7th Cir. 1985) (recognizing a "presumption in favor of approving" a consent decree negotiated by the Department of Labor in light of "the limitations of judicial competence and the desirability of encouraging out-of-court settlements in order to lighten the judicial caseload"); *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) ("the policy of the law to encourage settlements . . . has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement."); *United States v. Wisconsin Elec. Power Co.*, 522 F. Supp. 2d 1107, 1111 (E.D. Wis. 2007) (same; citing *Cannons Eng'g*) (cited hereinafter as "*WEPCO*").

[12]     An evidentiary hearing is *not* required in order to evaluate a proposed settlement of an environmental enforcement action. *See United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1085 (1st Cir. 1994) ("requests for evidentiary hearings are, for the most part, routinely denied – and properly so – at the consent decree stage in environmental cases"); *accord United States v. Metro. St. Louis Sewer Dist.*, 952 F.2d 1040 (8th Cir. 1992).

13

negotiations process, *i.e.*, whether it was open and at arms-length"); *BP Expl.*, 167 F. Supp. 2d at 1049 (same). But the court's assessment in a case like this should show "[r]espect for the agency's role . . . where the cards have been dealt face up and a crew of sophisticated players, with sharply conflicting interests, [sat] at the table." *Cannons Eng'g*, 899 F.2d at 84.

The negotiation process was eminently fair here. The settlement resulted from years of arms-length negotiations between 2018 and 2022. As explained above, both sides were represented by experienced environmental counsel who worked in tandem with expert technical and engineering advisors. Although the proposed pre-litigation settlement avoided the effort and expense of the discovery process, the parties' positions and the underlying facts were fully aired and vetted through inspections of CLCM's St. Francis and Oak Creek Facilities by EPA and Wisconsin DNR personnel, a formal information request under the Clean Air Act, and a great deal of dialog concerning EPA's and the State's Violation Notices and the potential terms of settlement.

### b. The Settlement is Substantively Fair, Reasonable, and Consistent with the Purposes of the Clean Air Act and RCRA.

"Substantive fairness concerns concepts of corrective justice and accountability." *WEPCO*, 522 F. Supp. 2d at 1112; *BP Expl.*, 167 F. Supp. 2d at 1049. And in assessing an environmental settlement's reasonableness and consistency with law, "one of the most important considerations . . . is the decree's likely effectiveness as a vehicle for cleansing the environment." *Lexington-Fayette*, 591 F.3d at 489 (internal quotations omitted). To put a finer point on it, a settlement should include appropriate relief chosen from among the "realistically available options" to target the particular environmental problems at issue in the lawsuit. *MWRD*, 792 F.3d at 827.

Here, EPA believes that the requirement that CLCM continuously operate the RTO at the St. Francis Facility, paired with other required improvements to CLCM's emission controls within the Facility, and alongside emissions monitoring and emissions verification approaches at the Facility, will help ensure Clean Air Act compliance and reduce emissions of VOCs. These emissions reductions and controls will also address the odor violations included in the Complaint in Intervention, as well as prior public concerns about odors and uncontrolled emissions that seemed to emanate from CLCM's St. Francis Facility.

Similarly, the improvements at the Oak Creek Facility will ensure Clean Air Act compliance and reductions to VOC and particulate matter emissions. Among other things, CLCM must maintain the temperature in the afterburner in the drum reclamation furnace at or above 1,650 degrees Fahrenheit. CD ¶ 20. By ensuring that conditions are sufficient for combustion (*i.e.*, requiring a minimum temperature in the afterburner), VOC and particulate matter emissions will be controlled at the Facility.

Finally, the stringent container management plan that CLCM must implement at both Facilities mandates timely, individual review of all containers that CLCM receives, safe and secure storage of any containers that contain excess residual waste, and detailed recordkeeping and reporting requirements to demonstrate compliance.

The United States could not expect to obtain better injunctive relief through litigation. The parties' exchange of technical views and information during the negotiations yielded Consent Decree compliance provisions that are intricate and custom-tailored. The Consent Decree includes some agreed features that the Court might not have been able to order if the case was contested and tried to judgment, such as stipulated penalties for noncompliance with injunctive relief obligations. The settlement's injunctive relief package secures air pollutant emission reductions that advance the purpose of the Clean Air Act. It also furthers the purposes

15

of RCRA by ensuring appropriate handling and recordkeeping for any residual and/or potential hazardous wastes received at the Facilities. The injunctive relief also represents a favorable alternative to the range of potential outcomes if the case was fully litigated.

As recognized in other cases, the United States customarily seeks and obtains substantial penalties for past noncompliance in environmental consent decrees as an important component of enforcement and to operate as a deterrent to future noncompliance by the defendant and by others. *See Lexington-Fayette*, 591 F.3d at 489 (reversing the district court's rejection of a Clean Water Act consent decree where the district court believed the $425,000 civil penalty was too high). Civil penalty assessments promote the purposes of the federal environmental laws precisely because they help "deter future violations." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). Here, the Consent Decree imposes an appropriately large $1,600,000 civil penalty.

In a civil judicial enforcement action like this, EPA has no power to determine the penalty other than by an agreed settlement with the defendant, because RCRA and the Clean Air Act require *the court* to assess the penalty when the parties litigate the case to judgment. *See* 42 U.S.C. § 6928(a)(1), (g); 42 U.S.C. § 7413(b), (e). It is impossible to predict whether this Court would have assessed a higher or lower penalty if this case was litigated.

When the United States filed its Complaint, the Clean Air Act and the Federal Civil Penalties Inflation Adjustment Act of 1990 would have allowed the Court to assess civil penalties of up to: (1) $37,500 per day for each violation that occurred between January 13, 2009, and November 2, 2015, inclusive; and (2) $101,439 per day for each violation that occurred after November 2, 2015. *See* ECF No. 1 at 12-13 (Complaint ¶ 65). But the Clean Air Act also requires a court to consider a variety of factors in setting the penalty in a particular case, as excerpted here:

> In determining the amount of any penalty to be assessed under this section . . . the Administrator or the court, as appropriate, shall take into consideration (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation.

42 U.S.C. § 7413(e)(1).

In addition, when the United States filed its Complaint, RCRA and the Federal Civil Penalties Inflation Adjustment Act of 1990 would have allowed the Court to assess civil penalties of up to $75,867 per day for each RCRA violation that occurred after November 2, 2015. *See* ECF No. 1 at 7 (Complaint ¶ 35). Unlike the Clean Air Act, RCRA does not specify the factors that should govern a judicial assessment of civil penalties under the law, but in RCRA cases courts have considered: (1) the good or bad faith of the defendant; (2) the injury to the public; (3) the defendant's ability to pay; (4) the necessity of vindicating the authority of the responsible government agency; and (5) the desire to eliminate the benefit derived from the violation. *See Torlaw Realty, Inc.*, 483 F. Supp. 2d at 974.[13]

The government case team considered many of the factors listed above in negotiating the penalty in this case; they are embedded in the analysis prescribed by longstanding EPA policy directives that guide settlement of civil penalty claims in Clean Air Act and RCRA cases.[14]

---

[13]    Civil penalties assessed in an environmental enforcement action like this must be paid to the general federal Treasury. *See United States v. Smithfield Foods, Inc.*, 982 F. Supp. 373, 374 (E.D. Va. 1997) (holding that a civil penalty imposed in an environmental enforcement action brought by the federal government constitutes "public money" and "it must be deposited with the Treasury, in accordance with the Miscellaneous Receipts Act, unless otherwise specified by Congress.").

[14]    *See, e.g.,* EPA*, Clean Air Act Stationary Source Civil Penalty Policy* (Oct. 25, 1991), available at https://www.epa.gov/enforcement/clean-air-act-stationary-source-civil-penalty-policy-october-25-1991; EPA, *Revisions to the Resource Conservation and Recovery Act*

17

Consistent with that EPA guidance, the following factors were accounted for in negotiating the penalty amount: (1) CLCM's economic benefit of noncompliance (including the time-value of delayed and avoided costs); (2) the actual or potential harm to the environment from CLCM's violations; (3) the importance of the regulatory schemes that CLCM violated; (4) the duration of CLCM's violations; (5) the size and economic health of CLCM's business; (6) CLCM's compliance history and cooperation in remedying the violations; and (7) case-specific litigation risk considerations. The resulting penalty in the Consent Decree represents a fair and reasonable agreed alternative to a litigated resolution, especially because it avoids the added costs, risks, and delays of litigation.

      **c.   The Points Raised by the Comment Do Not Justify Renegotiation or Rejection of the Consent Decree.**

The United States and the State were aware of Mr. Kramer's allegations about CLCM and its predecessors when the governments inspected CLCM's Facilities and negotiated the proposed Consent Decree. In his comments on the Consent Decree, Mr. Kramer indicates that he voiced his concerns about the operation of those Facilities in meetings with officials from EPA, Wisconsin DNR, and the U.S. Department of Justice. ECF No. 7-1 at 3-4. Mr. Kramer also was a featured source quoted in the series of Milwaukee Journal Sentinel articles about CLCM published between 2017 and 2019. Like the information that he supplied in those newspaper articles, Mr. Kramer's comments on the Consent Decree are based on his observations as "a safety consultant to CLCM in 2015-2016" (ECF No. 7-1 at 3). But the governments gathered much more information about CLCM's operations and compliance status between early 2017 and the lodging of the proposed Consent Decree in late 2022. The United States and the State

---

*(RCRA) Civil Penalty Policy* (June 23, 2003), https://www.epa.gov/sites/default/files/2020-05/documents/june2003rcracivilpenaltypolicyamended050620.pdf

18

continue to believe that the relief in the Consent Decree adequately addresses the Clean Air Act and RCRA violations that they identified in their lengthy and detailed governmental enforcement investigations.

As noted at the start of this brief, Mr. Kramer's comments on the Consent Decree fall into two general categories. First, he asserts that the relief secured is not adequate to ensure CLCM's compliance with hazardous waste requirements, and that the settlement does not address alleged past violations related to disposal of hazardous wastes by CLCM and its predecessors. Second, he claims that the penalty is insufficient to address: (a) prior non-compliance by CLCM and its predecessors, (b) RCRA violations by others in the container refurbishing industry; and (c) "retribution" and "retaliation" by CLCM in the separate and distinct civil litigation regarding his disclosures. The United States disagrees with both of those assertions.

As outlined above, the Consent Decree includes custom-crafted compliance requirements – and built-in monitoring, reporting, and enforcement mechanisms – that should help ensure CLCM's adherence to the Clean Air Act and RCRA requirements addressed in this case. Mr. Kramer's comments do not identify any specific added Facility improvements or operational changes that a settlement should require as relief for the Clean Air Act and RCRA violations addressed in this case.

The Consent Decree also would assess an appropriately large civil penalty for the alleged violations by CLCM, based on an application of established penalty assessment factors and published EPA guidance. As noted above, the United States believes the $1.6 million penalty that CLCM has agreed to pay is well within the range of foreseeable outcomes if this case was litigated to judgment. Mr. Kramer's comments offer no new information that would support a view that the governments undervalued the civil penalty claims being settled here. The

comments merely assert that CLCM should be required "to pay civil penalties in excess of $10 million." ECF No. 7-1 at 36.

Many of the allegations in Mr. Kramer's comments concern facilities in other states that are owned and/or operated separately by Greif, Inc., which is one of CLCM's joint venture participants. Greif is not a party to this proposed Consent Decree and this Consent Decree does not resolve liabilities for anything other than identified Clean Air Act and RCRA violations at CLCM's Milwaukee-area Facilities. CD ¶ 86. For that reason, the United States also disagrees with Mr. Kramer's suggestion that the civil penalty amount *for CLCM* should have been scaled up to account for *Greif's status* as a large "publicly-traded international corporation." ECF No. 7-1 at 29.

Finally, the Court should decline Mr. Kramer's plea to reject the Consent Decree – as "not in the public interest" – because it does not require dismissal of a separate and distinct private lawsuit. ECF No. 7-1 at 36. CLCM and Greif brought that pending lawsuit against a set of affiliated companies that employed Mr. Kramer when he served as a safety consultant for CLCM and Greif, and Mr. Kramer describes it as seeking "millions in damages . . . , plus attorney's fees, as a result of [his] federal whistleblowing activities." ECF No. 7-1 at 34, 36. The United States and the State should not be required to delay or compromise this settlement's benefits for the environment and public welfare through pursuit of another round of negotiations seeking an end to separate private litigation.

*   *   *

The proposed settlement would hold CLCM accountable for its past noncompliance with the Clean Air Act and RCRA and require improvements at both Facilities that will benefit the environment and promote the purposes of those laws. There is no certainty that the United States and the State would obtain a better outcome if the claims in the Complaint and Complaint in

20

Intervention were litigated to judgment. The Court should approve and enter the proposed

Consent Decree because it is fair, reasonable, and consistent with the objectives of the Clean Air

Act and RCRA.

## **Conclusion**

For the foregoing reasons, the Court should approve the proposed Consent Decree and

enter it as a final judgment in this case.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA:

Todd Kim
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

Dated:  March 16, 2023          /s/ Bonnie Cosgrove_____
Bonnie Cosgrove
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
450 Golden Gate Ave, Suite 07-6714
San Francisco, CA  94102
bonnie.cosgrove@usdoj.gov
415-744-0130

Gregory J. Haanstad
United States Attorney
Eastern District of Wisconsin

Michael Carter
Assistant United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Avenue, Room 530
Milwaukee, WI  53202

21

OF COUNSEL:

Jeffrey Cahn
Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 West Jackson Boulevard
Chicago, IL  60604

Chris Grubb
Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 West Jackson Boulevard
Chicago, IL  60604