# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>CONTAINER LIFE CYCLE<br>MANAGEMENT, LLC,<br><br>      Defendant,<br>and<br><br>STATE OF WISCONSIN,<br><br>      Intervenor. | Case No. 22-CV-1423-JPS<br><br>**ORDER** |

1. **INTRODUCTION AND BACKGROUND**

On November 30, 2022, the United States, "acting at the request and on the behalf of the Administrator of the United States Environmental Protection Agency ("EPA")," filed a complaint against Container Life Cycle Management, LLC ("CLCM"), alleging violations of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.*, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*, and the CAA and RCRA implementing permits and regulations. ECF No. 1 at 1. CLCM is in the business of refurbishing large industrial containers (namely, steel and plastic drums and plastic and metal totes) for reuse; it currently does so at facilities in St. Francis and Oak Creek, Wisconsin, and until June 2020, also did so at a facility in Milwaukee, Wisconsin. *Id.* at 3. The complaint alleges that CLCM (1) violated RCRA by mishandling and engaging in the

unlicensed storage of hazardous waste, and (2) violated the CAA by failing to properly seek or comply with permits for, and failing to control, emissions of volatile organic compounds ("VOC") and hazardous air pollutants ("HAP") at the above-mentioned facilities. *See generally id*. Alongside the United States' complaint, the State of Wisconsin ("Wisconsin") filed a motion to intervene in the case and a proposed complaint in intervention. ECF Nos. 2, 2-1. Further factual allegations from the complaint and complaint in intervention will be included as relevant in the body of this Order.

Together with its complaint and Wisconsin's motion to intervene, the United States lodged a proposed consent decree containing terms of a settlement between the parties, which would resolve CLCM's civil liability. ECF Nos. 3, 3-1. CLCM and Wisconsin were signatories to the proposed consent decree. ECF No. 3-1 at 65–66. The United States then sought public comment on the proposed consent decree.

On March 16, 2023, the United States moved for entry of the consent decree, indicating that both Wisconsin and CLCM did not oppose and indeed supported approval and entry thereof, and addressing the one public comment made in opposition to the proposed consent decree. *See generally* ECF No. 7-1. For the reasons stated herein, Wisconsin's motion to intervene and the United States' motion for entry of a consent decree will both be granted.

2.  **MOTION TO INTERVENE**

The same day that the United States filed its complaint, Wisconsin filed a motion to intervene in the case on the basis that the United States' CAA and RCRA claims "are based on statutes, regulations, and requirements administered by" the Wisconsin Department of Natural

Resources ("DNR"). ECF No. 2 at 3.[1] Wisconsin contends that the complaint in intervention shares common questions of law and fact with the United States' complaint, in that both complaints rely on a common set of facts and allege violations of Wisconsin statutes and regulations that work in tandem with the operative federal statutes. *Id.* at 3–4. Neither the United States nor CLCM opposes Wisconsin's motion. *Id.* at 4. Wisconsin states that its intervention will not unduly delay or prejudice disposition of this matter because it requested intervention at the commencement of this action. *Id.*

---

[1]CLCM's operations at its Wisconsin facilities result in the emission of VOC and HAP, and accordingly are subject to the CAA's regulatory requirements and permit limitations. ECF No. 8 at 6. Likewise, at these facilities, CLCM receives, stores, and generates materials that can be classified as "hazardous waste" under RCRA and accordingly are subject to that statute's record-keeping and management practices. *Id.* Implementation and enforcement of the CAA and RCRA take place at both the federal and state level. *See id.*

With respect to RCRA, the EPA has authorized Wisconsin to implement its own hazardous waste management program, deeming such program equivalent and consistent with the federal government's "base" hazardous waste regulations. ECF No. 1 at 4. Accordingly, "the activities of persons who generate, transport, treat, store, or dispose of hazardous waste" in Wisconsin are regulated under Wis. Stat. Ch. 291 and Wis. Admin. Code NR § 660 *et seq.*, which are incorporated by reference into RCRA. *Id.* The EPA may enforce the regulations of Wisconsin's authorized RCRA program. *Id.* at 7.

As to the CAA, states share responsibility with the EPA for implementation of and compliance with statutory aims. Two such aims are relevant to this action. First, the EPA sets national ambient air quality standards ("NAAQs") for six "criteria" air pollutants and their precursors. *Id.* at 7–8. In turn, states must adopt EPA-approved plans to implement, maintain, and enforce the NAAQs; those plans are then federally enforceable. *Id.* at 8. As relevant here, the EPA has approved Wis. Admin. Code NR §§ 406, 407, and 424.03 as part of Wisconsin's state plan for regulating pollutants consistent with the NAAQs. *Id.* at 8–9. Second, under the CAA, certain sources of air pollution must have an operating permit, and state and local air pollution control agencies are tasked with administering permit programs. *Id.* at 10. The EPA has approved Wisconsin's permit program, and those permit requirements are codified at Wis. Admin. Code NR § 407. *Id.* at 11.

A movant must be permitted to intervene in an action if: (1) the movant "claims an interest relating to the property or transaction that is the subject of the action"; (2) the disposition of the action "may as a practical matter impair or impede the movant's ability to protect its interest"; and (3) existing parties are not adequate representatives of the applicant's interest. Fed. R. Civ. P. 24(a)(2). Alternatively, a court may permit a party who so moves to intervene where that party "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In the case of a "state government officer or agency," that party may intervene if its claim is based on "a statute or executive order administered by the officer or agency" or "any regulation, order, requirement, or agreement issued or made under the statute or executive order." Fed. R. Civ. P. 24(b)(2). In any case, the motion to intervene must be "timely." Fed. R. Civ. P. 24(a), (b).

Wisconsin references all of the above bases as supporting its motion. ECF No. 2 at 2–3. Although it appears that any of them would allow the Court to conclude intervention is proper, the Court will grant Wisconsin's motion pursuant to Rule 24(a)(2). The Court examines each of that rule's requirements in turn.

As to timeliness, while Rule 24 does not set a specific time limitation for intervention, the Seventh Circuit has described the timeliness requirement as preventing a tardy intervenor from derailing a lawsuit "within sight of the terminal." *United States v. S. Bend Cmty. Sch. Corp.*, 710 F.2d 394, 396 (7th Cir. 1983). Wisconsin filed its motion upon commencement of this action; it is clearly timely and will not prejudice the United States or CLCM.

As to the interest elements, the "interest" of a would-be intervenor must be a "direct, significant, legally protectable" one. *Sec. Ins. Co. v. Schipporeit, Inc.*, 69 F.3d 1377, 1380 (7th Cir. 1995) (quoting *Am. Nat'l Bank v. City of Chicago*, 865 F.2d 144, 146 (7th Cir. 1989)). As one of the lead entities involved in regulating hazardous waste management and air quality in the state, Wisconsin clearly has a direct, significant, and legally protectable interest in this action. *See Lopez-Aguilar v. Marion Cnty. Sherriff's Dep't*, 924 F.3d 375, 392 (7th Cir. 2019) ("[T]he State has a *fundamental* interest in the maintenance of its legislatively mandated policy to cooperate fully with the federal government in the enforcement of immigration laws."). By the same token, if Wisconsin is not permitted to participate in this action, it may be forced to maintain a separate suit to enforce its environmental statutes and regulations. *See id.* ("We also have observed that requiring a would-be intervenor to assert his interest in a separate suit can amount to an 'impediment' justifying intervention as of right." (quoting *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 573 (7th Cir. 2009))).

For the same reason, the Court finds that the other parties to this action are not adequate to represent Wisconsin's interest. A party seeking intervention as of right must only make a showing that the representation "may be" inadequate, and "the burden of making that showing should be treated as minimal." *Lake Investors Dev. Grp., Inc. v. Egidi Dev. Grp.*, 715 F.2d 1256, 1261 (7th Cir. 1983) (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). Wisconsin has certainly met this lenient standard: as discussed above, it is directly involved in the implementation and enforcement of the relevant federal statutes. The United States' interests align with but do not supplant Wisconsin's.

In light of the foregoing and considering that no party has opposed Wisconsin's intervention, the Court will grant Wisconsin's motion to intervene, ECF No. 2. Wisconsin's complaint in intervention, ECF No. 2-1, will serve as the operative complaint in intervention in this matter.

3. **MOTION FOR CONSENT DECREE**

The United States moves for entry of the proposed consent decree it signed together with Wisconsin and CLCM, which is docketed at ECF No. 3-1. ECF No. 7. One public comment was received on the proposed consent decree, "rais[ing] public concerns about CLCM's handling of hazardous waste," *id.* at 2, and opposing entry of the consent decree as inadequate to address CLCM's wrongdoing. *See generally* ECF Nos. 7-1 and 9 (public comment and attachments). The commenter was Will Kramer ("Kramer"), who formerly worked as a safety consultant inspecting CLCM facilities. Kramer describes himself as a "whistleblower" who "observed systemic violations of RCRA that were built into the standard operating processes" at CLCM's Wisconsin facilities and whose "disclosures led directly to the investigation and findings of environmental and other violations that are the basis of" this case and the proposed consent decree. ECF No. 7-1 at 3–4.

The United States has submitted a brief in support of its motion, in which it argues that (1) the proposed consent decree is fair, reasonable, in the public interest, and consistent with the purposes of RCRA and the CAA, and (2) the points Kramer raises in his comment do not undermine this conclusion or preclude entry of the consent decree. ECF No. 8. The Court has considered the United States' brief, the terms of the proposed consent decree, and the substance of Kramer's comment. *See, e.g.*, *United States v. Sanitary Dist. of Highland, Ind.*, No. 2:22-CV-086-PPS-APR, 2022 WL

Page 6 of 19
Case 2:22-cv-01423-JPS    Filed 07/27/23    Page 6 of 19    Document 10

17547262 (N.D. Ind. Dec. 9, 2022) (extensively considering substance of "public comment critical of the consent decree[] being proposed" despite the commenter having "not formally move[d] to intervene"). For the reasons stated below, the United States' motion will be granted, and the consent decree will be entered.

### 3.1 Applicable Law

"[A] district court must approve a consent decree if it is reasonable, consistent with [relevant statutory] goals, and substantively and procedurally fair." *United States v. George Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011) (citing *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003)). In its review of the proposed consent decree, the district court "need not inquire into the precise legal rights of the parties, nor reach and resolve the merits of the parties' claims." *United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1049 (N.D. Ill. 2001). Rather, the court "should pay deference to the judgment of the government agency which has negotiated and submitted a proposed decree" and "must not substitute its judgment for that of the parties nor conduct the type of detailed investigation required if the parties were actually trying the case." *Id.* at 1050; *see also Whiting Paper*, 644 F.3d at 372 (instructing district courts to "defer to the expertise of the agency and to the federal policy encouraging settlement").[2] Although the court "must avoid any rubberstamp approval in favor of an independent evaluation . . . [t]he test is not whether [it] would have

---

[2]The *BP* court framed this deference a "presumption" in favor of adopting settlements that are otherwise reasonable and fair, and noted that this "presumption" is "particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal agency, like the [EPA]." *BP Expl.*, 167 F. Supp. 2d at 1050.

Page 7 of 19
Case 2:22-cv-01423-JPS    Filed 07/27/23   Page 7 of 19    Document 10

fashioned the same remedy nor whether it is the best possible settlement." *BP Expl.*, 167 F. Supp. 2d at 1050 (citations omitted).

### 3.2 Analysis

The Court examines, in turn, the proposed consent decree's procedural and substantive fairness, reasonableness, and consistency with statutory aims. The Court addresses the points Kramer raises in his comment as relevant to these factors.

#### 3.2.1 Procedural Fairness

"Procedural fairness concerns . . . whether [the negotiation process] was open and at arms-length." *United States v. Fort James Op. Co.*, 313 F. Supp. 2d 902, 907 (E.D. Wis. 2004); *see also United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990) ("To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." (collecting cases)). "Fairness should be evaluated from the standpoint of signatories and nonparties to the decree." *BP Expl.*, 167 F. Supp. 2d at 1051 (citing *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991)).

The United States represents that it, Wisconsin, and CLCM arrived at the proposed consent decree through "extensive settlement negotiations," ECF No. 8 at 4, which took place after both the EPA and the DNR conducted inspections and issued violations notices at CLCM's Wisconsin facilities, *id.* at 3–4. The negotiations took place over the course of four years (2018–2022) and, although they "avoided the effort and expense of the discovery process, the parties' positions and the underlying facts were fully aired and vetted." *Id.* at 15. Personnel from the EPA and the DNR were involved in negotiations alongside "experienced environmental counsel" and "expert technical and engineering advisors." *Id.*

All of the above facts support a finding that the proposed consent decree is procedurally fair and was reached through an open—and extensive—negotiation process in which key stakeholders and perspectives were actively involved, and who now approve of the proposed consent decree. These are the "standard indicia of procedural fairness." *Sanitary Dist. of Highland*, 2022 WL 17547262, at *8. The Court further notes that, during the comment period, the terms of the proposed consent decree were available in full to the public, facilitating examination and comment by anyone living near the facilities or affected by their activities. *See* Notice of Lodging of Proposed Consent Decree Under the Resource Conservation and Recovery Act and Clean Air Act, 87 Fed. Reg. 74,663 (Dec. 6, 2022) ("During the public comment period, the Consent Decree may be examined and downloaded at [the] Justice Department website[.]" (URL omitted)).

The Court discerns no specific challenges to procedural fairness in Kramer's comment. He takes issue with a lawsuit CLCM has brought against his former employer in the District Court for the Western District of Arkansas, ECF No. 7-1 at 30–37, alleging the lawsuit is retaliation for his whistleblowing, but he raises no specific objection to the process by which the parties *here* arrived at the proposed consent decree. Even if he had, say, argued that he and other members of the public did not have sufficient chance to examine and comment on the proposed consent decree or the underlying factual record, such concerns would not necessarily be dispositive on the issue of procedural fairness. *See BP Expl.,* 167 F. Supp. 2d at 1052 (rejecting arguments that a consent decree was procedurally unfair because, among other things, "the public did not learn of the proposed decree until the notice of lodging was filed," "no members of the public, including people in the eight states directly affected, were ever invited to

participate in the negotiation process," and "the underlying case was never exposed to the revealing light of public litigation").

### 3.2.2 Substantive Fairness

"Substantive fairness concerns concepts of corrective justice and accountability." *Id.* at 1051 (citing *Cannons Eng'g Corp.*, 899 F.2d at 86). "In assessing 'fairness,' courts consider: (1) a comparison of the strength of plaintiff's case versus the amount of settlement offer; (2) the likely complexity, length, and expense of the litigation; (3) the amount of opposition to the settlement among affected parties; (4) the opinion of counsel; and (5) the stage of the proceedings and amount of discovery already undertaken at the time of the settlement." *Id.* at 1051–52 (citing *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985)). The first factor typically warrants the closest scrutiny. *See United States v. United States Steel Corp.*, No. 2:18-CV-127 JD, 2021 WL 3884852, at *8–11 (N.D. Ind. Aug. 30, 2021).

The Court finds that the proposed consent decree displays these indicators of substantive fairness. Under the proposed consent decree, CLCM will pay a $1,600,000.00 penalty, to be split evenly between the United States and Wisconsin. ECF No. 8 at 17; *see also* ECF No. 3-1 at 13–15. Equally if not more important, the consent decree requires that CLCM implement emissions control measures as well as a container management plan for hazardous wastes at the St. Francis and Oak Creek facilities (as mentioned previously, the Milwaukee facility is not currently in operation). ECF No. 8 at 16; *see also* ECF No. 3-1 at 16–24 (CAA Compliance Requirements) and 15 (RCRA Compliance Requirements, incorporating by reference the Container Management Plan, filed at ECF No. 3-2). CLCM must report to the United States and Wisconsin semi-annually on its

compliance with these measures and has stipulated to pay penalties for non-compliance. ECF No. 3-1 at 32–35, 35–46.

The United States contends that the negotiated resolution is superior to a litigated judgment because the above-referenced emissions control and hazardous waste measures are "intricate and custom-tailored" and informed by technical expertise, and that it "could not expect to obtain better injunctive relief through litigation." ECF No. 8 at 16. The United States characterizes the $1.6 million penalty as both "appropriately large" and consistent with EPA civil penalty policy. *Id.* at 17–19. It further highlights that features such as the stipulated penalties provision likely would not be part of any judgment attained through litigation. *Id.* at 16.

The Court finds that the monetary and injunctive relief secured through the consent decree adequately reflects the strength of the case that the United States and Wisconsin could present at trial while simultaneously avoiding the risks and expenses associated with litigating such claims. CLCM has not admitted to any wrongdoing and therefore "could very easily take a more adversarial approach," *United States Steel Corp.*, 2021 WL 3884852, at *9.[3] Litigation of this case would likely be lengthy, complex, and expensive for all sides, and could result in *no* accountability whatsoever for

---

[3]Indeed, CLCM has already taken an adversarial approach in related state proceedings challenging the DNR-issued notices of violation; as part of the proposed consent decree, CLCM agrees to abandon that litigation. ECF No. 3-1 at 54–55 (referencing *Container Life Cycle Mgmt. LLC v. Dep't of Nat. Res.*, Wisconsin Supreme Court Case No. 2019AP1007, *available at* https://wscca.wicourts.gov/caseSearch.xsl (last visited July 5, 2023); *Container Life Cycle Mgmt. LLC v. Dep't of Nat. Res.*, Milwaukee County Circuit Court Case No. 2019CV1696, *available at* https://wcca.wicourts.gov (last visited July 5, 2023); and *Container Life Cycle Mgmt. LLC v. Dep't of Nat. Res.*, Milwaukee County Circuit Court Case No. 2019CV1733, *available at* https://wcca.wicourts.gov (last visited July 5, 2023)).

CLCM; the negotiated resolution avoids such a situation and instead cuts to the chase of holding CLCM immediately responsible for addressing its problematic environmental practices. This is a substantively fair result. This conclusion is bolstered by the fact that all parties to this case, guided by the opinions of competent counsel and accounting for facts disclosed through years of negotiations, are in agreement as to this negotiated resolution.

Although he has not framed it in these exact terms, it appears that Kramer is arguing that the consent decree is substantively unfair because it imposes an unduly small monetary penalty on CLCM *if* allegedly RCRA-violating conduct that took place at its Wisconsin facilities beginning in 1984 is taken into account. ECF No. 7-1 at 28 (positing that CLCM could be subject to a total penalty of $307 million for hazardous waste violations since 1984 and arguing that the $1.6 million penalty is "not commensurate with [CLCM's] long history of undermining RCRA's cradle-to-grave system for the proper tracking and disposal of hazardous waste"); *see also id.* at 37 (requesting that the Court impose "civil penalties in excess of $10 million"). Kramer also argues that the stipulated penalties for future violations of the proposed consent decree are "inappropriately low" and "effectively allow[] [CLCM] to continue to violate RCRA without fear of significant consequences." *Id.* at 28.

The United States responds by pointing out that Kramer, who was a safety consultant to CLCM in 2015–2016, knows less than the parties presently do about CLCM's "operation and compliance status between early 2017" and now. ECF No. 8 at 19. As a result, the United States contends that Kramer "offer[s] no new information that would support a view that the governments undervalued the civil penalty claims being settled here" or that the $1.6 million penalty is outside the range of

"foreseeable outcomes" of litigation or contrary to EPA policy. ECF No. 8 at 19–20.

The Court finds Kramer's argument unpersuasive because it casts too broad a net—while CLCM's conduct dating back decades may be concerning, the complaint and complaint in intervention place more recent alleged violations before the Court. Accordingly, those violations are what the Court expects the parties to this case to account for, and the Court finds the parties' negotiated penalties adequately do so. Moreover, although the United States has not submitted an exact metric of the total monetary penalties it would be statutorily authorized to recover for the alleged violations, the government in cases such as this one is permitted "to discount its potential claim to achieve an early settlement." *Fort James Op. Co.*, 313 F. Supp. 2d at 907. The Court will not second guess the United States' judgment that the penalty it seeks to impose on CLCM is "[c]onsistent with . . . EPA guidance" despite being lower than what might be statutorily authorized. ECF No. 8 at 19.

### 3.2.3 Reasonableness

"In evaluating the reasonableness of the consent decree, this Court considers: (1) the nature and extent of potential hazards; (2) the availability and likelihood of alternatives to the consent decree; (3) whether the decree is technically adequate to accomplish the goal of cleaning the environment; (4) the extent to which the consent decree furthers the goals of the statutes which form the basis of the litigation; (5) the extent to which this Court's approval of the consent decree is in the public interest; and (6) whether the consent decree reflects the relative strength or weakness of the Government's case against the Defendants." *BP Expl.*, 167 F. Supp. 2d at 1053 (citing *Akzo*, 949 F.2d at 1436, *Cannons Eng'g Corp.*, 899 F.2d at 89–90,

and *United States v. Seymour Recycling Corp.*, 554 F. Supp. 1334, 1339 (S.D. Ind. 1982)). Indeed, "[o]ne of the most important considerations when evaluating whether a proposed consent decree is reasonable is 'the decree's likely effectiveness as a vehicle for cleansing' the environment." *United States v. Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (quoting *Akzo*, 949 F.2d at 1437).

The United States argues that the proposed consent decree is reasonable because it requires CLCM to change its practices at the St. Francis and Oak Creek facilities in several meaningful ways. First, it requires that CLCM continuously operate a regenerative thermal oxidizer, which "controls VOC emissions from CLCM's container refurbishing process lines," at the St. Francis facility. ECF No. 8 at 9, 16. Second, it requires CLCM to "maintain the temperature in the afterburner in the drum reclamation furnace" at the Oak Creek facility at a specified temperature that "ensur[es] that conditions are sufficient for combustion," thereby guaranteeing proper control of VOC and particular matter emissions. *Id.* at 16. Third, the container management plan to be implemented at both facilities for a period of two years requires CLCM to review all containers it receives for refurbishing, safely and securely store those containers that contain excess residual waste, and complete detailed recordkeeping and reporting requirements on those containers. *Id.*

The Court finds that the proposed consent decree reflects the seriousness of the alleged violations at CLCM's Wisconsin facilities and responds to the hazards posed by CLCM's conduct with a detailed plan of action that is tailored to prevent their recurrence. The involvement of technical experts in crafting the plan further assures the Court that the plan can readily be implemented, and the fact that CLCM was at the bargaining

table indicates that the plan *will* be implemented (otherwise CLCM wouldn't have agreed to it). Where the alternative to adoption of the consent decree is, in all likelihood, protracted litigation that would occur at least partially at taxpayer expense, the Court is further persuaded that entry of the consent decree—and, as a result, prompt action by CLCM to address the environmental hazards occurring at its facilities—is in the public interest.

The Court understands Kramer's comment as primarily challenging the proposed consent decree as not in the public interest, in three respects. First, as discussed above, Kramer argues the proposed consent decree "fails to address [CLCM's] long history of systematically undermining the purpose of" RCRA. ECF No. 7-1 at 5. Kramer lays out a timeline of alleged violations of RCRA at various facilities affiliated with CLCM (including but not limited to those in Wisconsin) and argues that the consent decree does not adequately address this pattern of "systematic" violations. *Id.* at 5–29. Second, Kramer argues that the terms of the proposed consent decree "represent nothing more than a cost of doing business" and do not sufficiently deter other actors in the container reconditioning industry from engaging in the same wrongdoing. *Id.* at 28–29. Third, Kramer argues that the proposed agreement does not consider as an aggravating factor in any penalty imposed on CLCM the company's "efforts to silence whistleblowers and punish a third party as retribution" for the disclosures Kramer made that eventually led to this case. *Id.* at 29.

The Court has already dispensed with Kramer's first point and arrives at the same conclusion that any remedy it can fashion can only address those violations alleged in the operative pleadings; it is not in a position to redress environmental violations dating back decades. As to

Page 15 of 19
Case 2:22-cv-01423-JPS    Filed 07/27/23    Page 15 of 19    Document 10

Kramer's second point regarding industry-wide deterrence, the Court disagrees. The United States explicitly contemplated "CLCM's economic benefit of noncompliance" in negotiating the penalty amount, ECF No. 8 at 19, and has given the Court no reason to believe that it would set aside such a consideration in future enforcement actions against other violators in the industry. Regarding Kramer's third point, the Court does not at this time believe that an inquiry into a separate, private lawsuit is an appropriate consideration in the analysis. In sum, Kramer raises noteworthy concerns, but none persuade the Court that it is appropriate to upend the United States' and Wisconsin's judgment that the proposed consent decree is a reasonable resolution of their claims against CLCM. *Whiting Paper*, 644 F.3d at 372 (instructing district courts to "defer to the expertise of the agency and to the federal policy encouraging settlement").

### 3.2.4 Consistency with Statutory Aims

"A consent decree may not contravene the statute upon which the initial claims are based. Where a law suit [sic] seeks to enforce a statute, the most important factor as to public policy is whether the decree comports with the goals of Congress." *BP Expl.*, 167 F. Supp. at 1054 (citing *Sierra Club v. Coca–Cola Corp.*, 673 F. Supp. 1555, 1556 (M.D. Fla. 1987)). "One of the primary purposes of the CAA is to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population." *Id.* (citing 42 U.S.C. § 7401(b)(1)). "The purpose of the RCRA is to reduce generation of hazardous waste and to ensure proper treatment, storage, and disposal of waste which is nonetheless generated so as to minimize present and future threat to human health and the environment." *Id.* (citing 42 U.S.C. § 6902).

The Court finds that the above-referenced remedial measures and monetary penalty meet the aims of CAA and RCRA by ensuring that CLCM is held accountable for the past violations alleged in the complaint and for preventing future violations. Kramer points out that the EPA in September 2022 issued a Drum Conditioner Damage Case Report and argues that the proposed consent decree appears to be contrary to EPA policy expressed in that report. ECF No. 7-1 at 28–29. However, as above, the Court will not displace the United States' judgment that the consent decree is consistent with statutory aims, including those expressed in the EPA report.

4. **CONCLUSION**

For the foregoing reasons, the Court grants Wisconsin's motion to intervene and the United States' motion for entry of the proposed consent decree. The consent decree will be docketed separately.

The consent decree provides that

> [a]fter CLCM has completed the requirements of Sections V ["RCRA Compliance Requirements"], VI ["CAA Compliance Requirements"], VIII ["Approval of Deliverables"] of this Decree, has thereafter maintained satisfactory compliance with this Consent Decree for a period of two Years, has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, and has applied for and received all air permits necessary to ensure survival of the Consent Decree limits and standards identified in Paragraphs 40 and 41 after termination of this Consent Decree, CLCM may serve upon the United States and the State a Request for Termination, stating that CLCM has satisfied those requirements, together with all necessary supporting documentation.

ECF No. 3-1 at 59. If the United States and Wisconsin accept such a request from CLCM, "the [p]arties shall submit, for the Court's approval, a joint stipulation and agreed order terminating the [consent] [d]ecree." *Id.* If the

parties are not in agreement as to termination, the issue will be submitted to dispute resolution. *Id.*

Accordingly, because the consent decree effectively requests that the Court retain jurisdiction over this matter for a period of at least two years, the Court will administratively close the case at this time pending further action from the parties. If the parties agree to terminate the consent decree, the Court will formally dismiss the case upon receipt of their stipulation to terminate the consent decree. Alternatively, if the issue of termination is submitted to dispute resolution, the United States should file a notice indicating as much, and the term of the consent decree shall be extended for the sole purpose of resolution of the issues raised in such disputes (and the Court will retain jurisdiction of this matter to enforce the consent decree) until such time as all such disputes have been resolved.

Accordingly,

**IT IS ORDERED** that the State of Wisconsin's motion to intervene, ECF No. 2, be and the same is hereby **GRANTED**; the complaint in intervention, ECF No. 2-1, will serve as the operative complaint in intervention in this matter;

**IT IS FURTHER ORDERED** that the United States' motion for entry of the consent decree, ECF No. 7, be and the same hereby is **GRANTED**; the Court will enter the parties' consent decree in a separate docket entry upon the filing of this Order;

**IT IS FURTHER ORDERED** that the Court will retain jurisdiction of this matter as set forth in this Order; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **ADMINISTRATIVELY CLOSED**.

Dated at Milwaukee, Wisconsin, this 27th day of July, 2023.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge

Page 19 of 19
Case 2:22-cv-01423-JPS   Filed 07/27/23   Page 19 of 19   Document 10